**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS BEAUMONT DIVISION**

| | | |
|---|---|---|
| **MARVIS BROWN, an individual,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:12-CV-00253** |
| | ) | |
| **WEBCO INDUSTRIES, INC.** | ) | **U.S. Magistrate Judge Keith F. Giblin** |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND BRIEF IN SUPPORT**

**STRECKER & ASSOCIATES, P.C.**

*/s/ Yvette Braaks Hart*
David E. Strecker, OBA #8687
Yvette Braaks Hart, OBA #19476
2150 Mid-Continent Tower
401 South Boston Avenue
Tulsa, Oklahoma 74103-4009
Telephone:    (918) 582-1716
Facsimile:    (918) 582-1780
**ATTORNEYS FOR THE DEFENDANT**

**CASHIOLA AND BEAN**
Randal Cashiola, Texas Bar No. 03966802
2090 Broadway, Suite A
Beaumont, Texas 77701
Telephone:    (409) 813-1468
Facsimile:    (409) 813-1467
E-mail:  rcashiola@cashiolabean.law

## TABLE OF CONTENTS

INDEX OF EXHIBITS ............................................................................................................... iii

TABLE OF AUTHORITIES ..................................................................................................... iv

I.      INTRODUCTION .......................................................................................................1

II.     COMPANY INFORMATION......................................................................................2

III.    UNDISPUTED FACTS – GENERAL .........................................................................3

IV.     UNDISPUTED FACTS – COUNT ONE – SEXUAL HARASSMENT .....................11

V.      UNDISPUTED FACTS – COUNT TWO – RACIAL DISCRIMINATION ..............14

VI.     UNDISPUTED FACTS – PLAINTIFF'S TERMINATION........................................17

VII.    UNDISPUTED FACTS – POST TERMINATION ....................................................19

VIII.   ARGUMENTS AND AUTHORITIES.......................................................................20

        A.   Standard for Summary Judgment.....................................................................20

        B.   Plaintiff Has Not Presented a Claim for Retaliation ........................................21

        C.   Brown Cannot Establish a Case of Sex Discrimination Via Same-Sex Harassment

             Under Title VII ...............................................................................................23

             1. Even if Plaintiff could establish the alleged conduct constitutes
                discrimination because of sex, he cannot establish such conduct created a
                hostile work environment .............................................................................28
                a.   Tangible Employment Action................................................................28
                b.   Hostile Environment ............................................................................29
             2. Should the Court find Mr. Saunders' alleged conduct created a hostile
                environment, Webco is not liable under the *Ellerth/Faragher* affirmative
                defense ........................................................................................................32

        D.   Brown's Claim of Racial Discrimination Fails to Satisfy the Legal Requirements ..........36

IX.     CONCLUSION..........................................................................................................39

## <u>INDEX OF EXHIBITS</u>

Exhibit 1        Webco Open Door Policy

Exhibit 2        Affidavit of Sally Allen

Exhibit 3        Excerpts from Deposition Transcript of Plaintiff, Marvis Brown

Exhibit 4        Employment Application for Marvis Brown

Exhibit 5        Welcome Letter for Marvis Brown

Exhibit 6        Receipts of Employee Handbook signed by Marvis Brown

Exhibit 7        Excerpts from Employee Handbook

Exhibit 8        Receipt of Training signed by Marvis Brown on 4/5/06

Exhibit 9        Receipt of Training signed by Marvis Brown on 7/23/08

Exhibit 10       90-Day Evaluation of Marvis Brown

Exhibit 11       Performance Evaluation of Marvis Brown 7/05 - 12/05

Exhibit 12       Performance Evaluation of Marvis Brown 1/06 - 6/06

Exhibit 13       Performance Evaluation of Marvis Brown 7/06 - 12/06

Exhibit 14       Performance Evaluation of Marvis Brown 1/07 - 6/07

Exhibit 15       Performance Evaluation of Marvis Brown 12/08

Exhibit 16       Performance Evaluation of Marvis Brown 6/09

Exhibit 17       Employee Consultation Form for Marvis Brown dated 11/23/09

Exhibit 18       Performance Evaluation of Marvis Brown 12/09

Exhibit 19       Performance Evaluation of Marvis Brown 12/10

Exhibit 20       Incident/Hazard Report for Marvis Brown dated 9/16/10

Exhibit 21       Employee Consultation Form for Marvis Brown dated 9/17/10

Exhibit 22       Excerpts from Deposition Transcript of Laura Brewer

## TABLE OF AUTHORITIES

**Cases**

*Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570 (5th Cir. 2003) . . . . . . . . . . . . . . . . .  22

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) . . . . . . . . . . . . . . . . . . . . . . . 28, 30, 32, 34

*Casiano v. AT&T Corp.*, 213 F.3d 278 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28, 29

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Cherry v. Shaw Coastal, Inc.*, 668 F.3d 182 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*EEOC v. Boh Bros. Construction Co.*, 689 F.3d 458 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . 23

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 32, 34

*Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . 38

*Harper v. City of Jackson Mun. Sch. Dist.*, 149 Fed. Appx. 295 (5th Cir. 2005) (unpublished) . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 30

*Hockman v. Westward Communs., L.L.C.*, 407 F.3d 317 (5th Cir. 2004) . . . . . . . . . . . . . . . . . 29

*Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . 38

*Indest v. Freeman Decoration*, 164 F.3d 258 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*Jones v. Flagship Int'l*, 793 F.2d 714 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Johnson v. Hondo, Inc.*, 125 F.3d 408 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

*Kummerle v. EMJ Corp.*, 2013 U.S. App. LEXIS 9856 (5th Cir. May 16, 2013) . . . . . . . . . . . 25

*Kreamer v. Henry's Marine, et al.*, 2004 U.S. Dist. LEXIS 206775 (E.D. La. 2004) . . . . . . . . 27

*LaDay v. Catalyst Tech., Inc.*, 302 F.3d 474 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . 24, 26, 27, 28

*Lauderdale v. Tex. Dep't of Crim. Justice*, 512 F.3d 157 (5th Cir. 2007) . . . . . . . . . . . . . . . . . 32

*Lechuga v. S. Pac. Transp.*, 949 F.2d 790 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lucas v. Dover Corp., Norris Div.*, 857 F.2d 1397 (10th. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . 38

*McCoy v. City of Shreveport*, 492 F.3d 551 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*McDonnell Douglass v. Green*, 411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*McVille v. Inter-Community Healthcare, Inc.*, 460 Fed. Appx. 353 (5th Cir. 2012) (unpublished)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Oncale v. Sundower Offshore Servs.*, Inc., 523 U.S. 75 (1998) . . . . . . . . . . . . . . . . 23, 24, 26, 28

*Russell. v. Univ. of Tex.*, 234 Fed. Appx. 195 (5th Cir. 2007) (unpublished) . . . . . . . . . . . 23, 24

*Septimus v. Univ. of Hous.*, 399 F.3d 601 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*Shaw v. AutoZone, Inc.*, 180 F.3d 806 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Stewart v. Mississippi Transport Comm.*, 586 F.3d 321 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . 21

*Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 25, 28

*Wasek v. Arrow Energy Sevs. Inc.*, 682 F.3d 463 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . . 27, 28

*Williams v. Barnhill's Buffet*, 2007 U.S. Dist. LEXIS 95568 (S.D. Miss. 2007) . . . . . . . . . . . . 36

*Woods v. Delta Bev. Grp, Inc.*, 274 F.3d 295 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Wyatt v. Hunt Plywood Co.*, 297 F.3d 405 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Young v. R.R. Morrison and Son, Inc.*, 159 F. Supp. 2d 921 (N.D. Miss. 2000) . . . . . . . . . . . . 35

**Statutes**

42 U.S.C. § 2000e-3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

42 U.S.C. §§ 2000e *et. seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Rules**

FED. R. CIV. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 20

FED. R. APP. P. 32.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**Other Authorities**

B. LINDEMANN & D. KADUE, SEXUAL HARASSMENT IN EMPLOYMENT LAW (1992) . . . . . . . . . . 25

### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF TEXAS BEAUMONT DIVISION

| | | |
|---|---|---|
| **MARVIS BROWN, an individual,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:12-CV-00253** |
| | ) | |
| **WEBCO INDUSTRIES, INC.** | ) | **U.S. Magistrate Judge Keith F. Giblin** |
| **Defendant.** | ) | |
| | ) | |

## MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

COMES NOW Defendant, Webco Industries, Inc. ("Defendant" or "Webco")  pursuant to Rule 56 of the Federal Rules of Civil Procedure and Eastern District of Texas – Beaumont Division Local Rule CV7(a)(1) and Local Rule CV56, and hereby moves the Court for summary judgment in its favor on all of Plaintiff's claims in this matter.  Defendant is entitled to summary judgment on the grounds that the pleadings and exhibits, when taken in their entirety and in light most favorable to the opposing party, show that there is no substantial controversy as to any material fact and that Defendant is entitled to summary judgment as a matter of law.  In support of its Motion for Summary Judgment, Defendant offers the following:

## I.   INTRODUCTION

The Complaint filed by Plaintiff, Marvis Brown, ("Mr. Brown"),  alleges two (2) specific counts, one alleging sexual harassment (same-sex) and one alleging racial discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et. seq*.  Additionally, the Complaint is capable of being construed as asserting a claim for retaliatory discharge, although that claim is not specifically pled.  In support of these claims, Mr. Brown sets forth allegations claiming that: (1) he was forced to work in a sexually hostile environment for the last five (5) years of his employment with Webco; (2) he was passed over for promotion by equally or less

1

qualified white employees; and (3) he was subjected to facially neutral treatment that was racially discriminatory in its application and practice.  While Mr. Brown would like to convince the Court that the employment decisions made by Webco were racially motivated, the evidence clearly indicates that this is not the case.  Further, the evidence regarding Mr. Brown's allegation of same-sex sexual harassment fails to satisfy the requirements of the law. Mr. Brown is no longer employed with Webco as a direct result of his insubordination and use of insulting and vulgar language towards his boss, Laura Brewer ("Ms. Brewer") (General Business Manager).

Thus, as will be shown, Mr. Brown cannot make a *prima facie* showing on his claims of same-sex sexual harassment and racial discrimination.  Therefore, summary judgment should be granted.

## II.     COMPANY INFORMATION

Webco is a manufacturer and distributor of high quality, specialty steel tubing.   The Company was founded in 1969 by F. William Weber and its corporate headquarters are located in Tulsa, Oklahoma ("Corporate Office").  Webco has a manufacturing and distribution center in Orange, Texas ("Orange Facility" or the "Facility").

Corporate Office plays an active role at the Orange Facility, with the Vice President/General Manager, Patti Jordan ("Ms. Jordan") and the Divisional Human Resources Manager, Sally Allen ("Ms. Allen"), visiting the Facility frequently and maintaining regular contact with the Facility's General Business Manager and the various Shift Business Managers (also known as Shift Leaders).  Webco's Employee Handbook contains an Open Door Policy which "provides an avenue for fair and consistent treatment of every employee." (***Webco Open Door Policy – Exhibit 1***).  The General Business Manager (who at the time of Mr. Brown's termination was Ms. Brewer) reports directly to Ms. Jordan and is responsible for the day-to-day operations of the

Orange Facility; essentially the General Business Manager oversees maintenance, quality, inventory, and personnel.   A Shift Business Manager (also known as a Shift Leader) is a leadership position which is responsible for job assignments, job safety, production quality, and personnel during his assigned shift – day or night.   The authority structure at the Orange Facility with regard to hiring, discipline, and firing is as follows:

- The General Business Manager and Shift Business Managers have significant input in the decision to hire an individual, but actual hiring authority is held by the Divisional Human Resource Department, which is located in Tulsa, Oklahoma.

- Shift Business Managers have the authority to write an employee up; however, it must be approved and reviewed by the General Business Manager and Divisional Human Resource Manager prior to the Consultation Form being given to the employee.   This write-up (labeled Employee Consultation Form) typically must be reviewed and signed by the Shift Business Manager, the General Business Manager, the General Manager, and the Human Resource Manager.

- Only the Director/Manager of Human Resources, in conjunction with the responsible Vice President/General Manager, may authorize the termination of an employee.

*Affidavit of Sally Allen***, Exhibit 2**.

## III.     UNDISPUTED FACTS - GENERAL

1.   One of Mr. Brown's employers prior to Webco was Equitable Bag.   *Deposition of Plaintiff, Marvis Brown,* **hereinafter Exhibit 3,** p. 38, ln. 14 – ln. 18.   During his time there, Mr. Brown was suspended for fifteen (15) days, but he does not recall why.   **Exhibit 3**, p. 42, ln. 18 – ln. 25.

2.   Prior to commencing work at Webco, Mr. Brown also worked at Akrotex Films.  While employed at Akrotex Films Mr. Brown filed an EEOC charge alleging racial discrimination. **Exhibit 3**, p. 13, ln. 8 – ln. 10 and p. 14, ln. 23 – ln. 25 and p. 15, ln. 1 – ln. 7.

3.   Mr. Brown achieved the position of supervisor at Akrotex Films.  **Exhibit 3**, p. 14, ln. 13 – ln. 16.   While working as a supervisor, Mr. Brown was suspended for performance issues regarding a line going down.  **Exhibit 3**, p. 33, ln. 20 – p. 34, ln. 7.

4.   While working as a supervisor at Akrotex Films, Mr. Brown attended an approximately 6-week course in management training, which included specific training on sexual harassment, at Lamar University.  **Exhibit 3**, p. 19, ln. 23 – p. 20, ln. 20.

5.   Mr. Brown came away from that training with a good understanding as to sexual harassment and what a company should do to prevent it and how they should investigate any claims.  **Exhibit 3**, p. 20, ln. 22 – p. 21, ln. 7.

6.   According to Mr. Brown, when he was a supervisor and was presented with a problem with an employee he "tried to work that problem out with that individual, basically, keep out – keep management out of it.  **Exhibit 3**, p. 23, ln. 1 – ln. 3.   If he determined that he could not handle the situation he would "bring it to someone that had more authority."  **Exhibit 3**, p. 23, ln. 12 – ln. 13.

7.   When Mr. Brown applied for employment with Webco, he indicated on his application that he was applying for an entry level position and that he was available for any shift.  **Exhibit 3**, p. 25, ln. 23 – p. 26, ln. 14. (***Employment Application for Marvis Brown* – Exhibit 4**)

8.   Mr. Brown came to work for Webco as an entry level employee on the night shift on April 6, 2005.  **Exhibit 3**, p. 48, ln. 18-24.  (***Welcome Letter for Marvis Brown* – Exhibit 5**)

9.  Mr. Brown believed Webco would provide an opportunity for "a better job" in the only way that mattered to him – more money.  **Exhibit 3**, p. 28, ln. 14 – ln. 20.

10. Upon commencing his employment with Webco, Mr. Brown received an Employee Handbook and signed a Receipt of Handbook.  **Exhibit 3**, p. 51, ln. 11 – ln. 16. (***Receipts of Employee Handbook Signed by Marvis Brown** – **Exhibit 6***)

11. In addition to receiving the Employee Handbook, Mr. Brown received training on Webco's policies.  **Exhibit 3**, p. 55, ln. 4 – ln. 24. (***Employee Handbook** – **Exhibit 7***)

12. Mr. Brown was aware that Webco had in place policies on Anti-Harassment and Sexual Harassment and "read some of it."  **Exhibit 3**, p. 54, ln. 3 – ln. 9; p. 63, ln. 23 – p. 64, ln. 3 and **Exhibit 7**.

13. Mr. Brown also knew "that employees were to refrain from behavior or conduct deemed offensive or undesirable."  **Exhibit 3**, p. 65, ln. 10 – ln. 13.

14.  Further, Mr. Brown understood that "employees had an obligation to report harassment, including sexual harassment."  **Exhibit 3**, p. 64, ln. 9 – ln. 12.

15. Mr. Brown also understood that an employee could go directly to human resources with a report of harassment and that retaliation "against someone who reported harassment" was prohibited by Company policies.  **Exhibit 3**, p. 64, ln. 13 – ln. 20 and **Exhibit 7**.  Furthermore, Mr. Brown was never told by Rayford Bruno ("Mr. Bruno") (African-American male), Shift Leader; Ms. Brewer (White female), General Business Manager; Matt Saunders ("Mr. Saunders") (White male), Shift Leader, or anyone in management that he would be fired for bringing problems to the attention of Ms. Jordan or Ms. Allen.   **Exhibit 3**, p. 189, ln. 2 – ln. 25.

16. When Ms. Jordan visited the Facility she spent a lot of time visiting and speaking with the night shift and "she was definitely available."  **Exhibit 3**, p. 186, ln. 17 – ln. 23.

17. According to Mr. Brown, while employed by Webco he attended training sessions on some of the Company's policies where he "may have had training on as much of it as they could have possibly gave us at that time."  **Exhibit 3**, p. 67, ln. 15 – ln. 20.  Ms. Allen facilitated a training attended by Brown on April 5, 2006.  **Exhibit 3**, p. 68, ln. 6 – ln. 15. (***Receipt of Training – 4/5/06 – Exhibit 8***)

18. Mr. Brown recalls receiving Sexual Harassment/Diversity training in June 2008.  **Exhibit 3**, p. 70, ln. 7 – ln. 20.  (***Receipt of Training – 7/23/08 – Exhibit 9***).  Further, Mr. Brown knows that "Webco basically has a zero policy -- a – a zero policy for sexual harassment and for discrimination."  **Exhibit 3**, p. 70, ln. 23 – ln. 25.  Mr. Brown clarified his statement, saying he meant "zero tolerance."  **Exhibit 3**, p. 71, ln. 1 – ln. 2.

19. Mr. Saunders and Mr. Brown had an incident early in Mr. Brown's employment with Webco.  **Exhibit 3**, p. 160, ln. 21 – p. 161, ln. 4.  This incident occurred before Mr. Saunders was a supervisor.  **Exhibit 3**, p. 160, ln. 23.  Essentially, Mr. Saunders jerked Mr. Brown's Missouri Tigers hat off his head and made a crude gesture with it.  **Exhibit 3**, p. 161, ln. 13 – ln. 14.  This action led to an agreement to meet at the Shell station located nearby after work to address the situation.  **Exhibit 3**, p. 161, ln. 15 – ln. 18.  Ultimately, no blows were exchanged.  **Exhibit 3**, p. 162, ln. 23.

20. While employed at Webco, Mr. Brown received performance reviews.  **Exhibit 3**, p. 74, ln. 13 – ln. 15.

21. A majority of Mr. Brown's reviews were given by Mr. Saunders.  **Exhibit 3**, p. 74, ln. 16 – ln. 19.

22. While Mr. Brown claims that Mr. Bruno gave him superior reviews, he also states that Mr. Bruno should have rated him higher.  **Exhibit 3**, p. 75, ln. 3 – ln. 4 and p. 76, ln. 23 – ln. 25.

6

Specifically, Mr. Bruno gave Mr. Brown his 90-day review.  **Exhibit 3**, p. 75, ln. 25 and p. 76, ln. 8 – ln. 10.  Mr. Brown believes that Mr. Bruno's statement that he was an "ideal employee" was not high enough.  **Exhibit 3**, p. 77, ln. 1 – ln. 6. (***90-Day Evaluation*** – **Exhibit 10**)

23. Another supervisor, Doug Fincher ("Mr. Fincher"), reviewed Mr. Brown in December 2005.  **Exhibit 3**, p. 79, ln. 17 – ln. 19 and p. 80, ln. 5 – ln. 22.  Mr. Brown received "2's" (successful) on his evaluation and while he found this unacceptable, he does not believe his race had anything to do with this evaluation.  **Exhibit 3**, p. 82, ln. 1 – ln. 8. (***Performance Evaluation 7/05 – 12/05*** – **Exhibit 11**)

24. Mr. Fincher again reviewed Mr. Brown in June 2006.  **Exhibit 3**, p. 89, ln. 2 – ln. 4 and p. 90, ln. 21 – p. 91, ln. 3.  At this time Mr. Brown was a Tech 2.  **Exhibit 3**, p. 89, ln. 23 – ln. 25.  Mr. Brown received a "2" overall, but did not agree with his rating as he felt he "was putting out more than anybody else" and that he was "putting more into" his work "than anyone else." **Exhibit 3**, p. 91, ln. 15 and ln. 18 – ln. 19.  (***Performance Evaluation 1/06 - 6/06*** – **Exhibit 12**)

25. Mr. Brown does not believe that Mr. Fincher was racially biased against him.  **Exhibit 3**, p. 91, ln. 3 – ln. 9.

26. In December 2006 Mr. Brown received a Tech 3 evaluation.  **Exhibit 3**, p. 94, ln. 6 – ln. 8 and ln. 21 – ln. 25.  Despite an overall rating of "2" (successful), Mr. Brown was not satisfied. **Exhibit 3**, p. 97, ln. 15 – ln. 20.  Per Mr. Brown, race had nothing to do with this evaluation. **Exhibit 3**, p. 98, ln.5 – ln. 7. (***Performance Evaluation 7/06 - 12/06*** – **Exhibit 13**)

27. Mr. Fincher commented, in Mr. Brown's June 2007 evaluation, that Mr. Brown was one of the Company's "most dependable employees" and that he had "a very positive attitude when he is at work."  **Exhibit 3**, p. 98, ln. 16 – ln. 18 and p. 98, ln. 25 – p. 99, ln. 1.  Mr. Brown's

overall rating on this evaluation was "2" (successful), but he believed it should have been higher. **Exhibit 3**, p. 99, ln. 9 – ln. 12. (***Performance Evaluation 1/07 - 6/07*** – **Exhibit 14**)

28. Mr. Brown was promoted to a Tech 4.  **Exhibit 3**, p. 101, ln. 25 – p. 102, ln. 3.  He has an idea that Mr. Bruno, Mr. Saunders, and Mr. Fincher played a role in the decisions to promote him.  **Exhibit 3**, p. 102, ln. 4 – ln. 12.

29. In December 2008, Mr. Brown received a Tech 4 expert evaluation prepared by Mr. Saunders.  **Exhibit 3**, p. 102 ln. – p. 103, ln. 2 and ln. 11 – ln. 23.  Mr. Saunders wrote that Mr. Brown "has a great attitude" and Mr. Brown agreed with this comment.  **Exhibit 3**, p. 103, ln. 3 – ln. 6.  Overall, though, Mr. Brown did not agree with how Mr. Saunders rated him.  **Exhibit 3**, p. 103, ln. 24 – p. 104, ln. 1.  Mr. Brown does not believe that race had anything to do with this evaluation.  **Exhibit 3**, p. 104, ln. 25 – p. 105, ln. 2. (***Performance Evaluation 12/08*** – **Exhibit 15**)

30. Mr. Brown did not agree with any of his performance evaluations because none acknowledged his prior supervisory experience.  **Exhibit 3**, p. 104, ln. 3 – ln. 6.  Specifically, Mr. Brown was of the opinion that he "was a step ahead" because of "his experience and knowledge." **Exhibit 3**, p. 104, ln. 8 – ln. 9.

31. In June 2009, Mr. Brown received a Tech 4 Expert evaluation from Mr. Bruno.  **Exhibit 3**, p. 105, ln. 9 – ln. 19.  Mr. Brown received an overall rating of "1" (needs improvement) and a "1" on Skills/Knowledge. (***Performance Evaluation 06/09*** – **Exhibit 16**).  It is noted in this evaluation that Mr. Brown must learn "to operate the HEM saw, polisher, and perform advanced shop floor transactions."  **Exhibit 3**, p. 105, ln. 21 – ln. 25.  Mr. Brown disagreed with this comment and believes that it was a discriminatory comment.  **Exhibit 3**, p. 106, ln. 1 – ln. 4.

32. According to Mr. Brown, he felt he was "hindered" because he was black.  **Exhibit 3**, p. 106, ln. 8 – ln. 9.  Because there "were no African-Americans other than Rayford Bruno that were trained on the HEM saw" he was discriminated against.  **Exhibit 3**, p. 106, ln. 4 – ln. 7.

33. Mr. Brown admits that he does not know how to operate a HEM saw or a polisher.  **Exhibit 3**, p. 108, ln. 8 – ln. 9 and ln. 14 – ln. 20.

34. On November 23, 2009, Mr. Brown received an employee consultation form regarding a racial comment Mr. Brown had made to a white co-worker, Chris Miller ("Mr. Miller").  **Exhibit 3**, p. 149, ln. 3 – ln. 18 and ln. 19 – ln. 24.  During a discussion regarding a movie that involved suspending a person using hooks, Mr. Brown told Mr. Miller "that he should bring the hooks" and Mr. Brown "would do it for free" stating "[l]ook at all the black men that have been hung."  **Exhibit 3**, p. 151, ln. 24 – p. 152, ln. 2.  Mr. Brown considers his remark to have been a racist one and in violation of Webco's Anti-Harassment Policy.  **Exhibit 3**, p. 152, ln. 3 – ln. 8.  (***Employee Consult Form dated 11/23/09* – Exhibit 17**)

35. Ms. Brewer, Mr. Saunders, Mr. Miller, and Mr. Brown had a meeting on November 30, 2009, to discuss getting along and Webco's Anti-Harassment and Discrimination Policies.  **Exhibit 3**, p. 155, ln. 11 –p. 156, ln. 3.  Mr. Brown believed that those involved in the meeting were serious.  **Exhibit 3**, p. 160, ln. 18 – ln. 20.

36. Mr. Brown received another performance evaluation from Mr. Saunders in December 2009.  **Exhibit 3**, p. 112, ln. 20 – ln. 21.  (***Performance Evaluation 12/09* – Exhibit 18**)  According to the comments written by Mr. Saunders, becoming more of a leader was a goal set for Mr. Brown.  Mr. Brown disagreed with the goal, believing he "was already a leader."  **Exhibit 3**, p. 115, ln. 9 – ln. 16 and p. 116, ln. 24 – ln. 25.

37. Mr. Brown received his final performance evaluation in December 2010. **Exhibit 3**, p. 122 ln. 2 – ln. 9. (***Performance Evaluation 12/10 – Exhibit 19***). Mr. Saunders reviewed Mr. Brown and gave him an overall rating of "2" (successful), with which Mr. Brown disagreed. **Exhibit 3**, p. 130, ln. 20 – ln. 21. Mr. Brown believed he should have been rated higher. **Exhibit 3**, p. 130, ln. 22 – ln. 23.

38. The evaluation referenced two (2) write-ups Mr. Brown received in the six (6) months preceding the evaluation. **Exhibit 3**, p. 123, ln. 24 – p. 124, ln. 1 and **Exhibit 19**. The first write-up was for quality issues with an annealer job and the second was for hitting a forklift while operating a crane. **Exhibit 3**, p. 124, ln. 4 – ln. 10. (***Incident/Hazard Report dated 9/16/10 – Exhibit 20*** and ***Employee Consultation Form dated 9/17/10 – Exhibit 21***).

39. At some point in time, Mr. Brown doesn't recall when, he requested to be moved to the day shift. **Exhibit 3**, p. 158, ln. 14 – ln. 16. Because of Mr. Brown's home situation, moving to days would have been "ideal." **Exhibit 3**, p. 157, ln. 21 – p. 158, ln. 1.

40. Mr. Saunders and Mr. Bruno did not have a problem with Mr. Brown's request. **Exhibit 3**, p. 159, ln. 11 – ln. 17 and p. 247, ln. 17 – ln. 19, ln. 21 – ln. 22. Ms. Brewer said he could move to days. **Exhibit 3**, p. 159, ln. 20 – ln. 22 and p. 247, ln. 14 – ln. 15. Ms. Brewer believed Mr. Brown to be qualified to be on the day shift. ***Deposition of Laura Brewer*, hereinafter Exhibit 22**, p. 22, ln. 7 – ln. 9 and ln. 20 – ln. 22.

41. Mr. Brown, however, felt like "they took like a long time to – to do it, whatever." **Exhibit 3**, p. 159, ln. 24 – ln. 25.

42. Mr. Brown had been told by Ms. Brewer, Mr. Saunders, Mr. Bruno, and Mr. LeBert that he was being moved to the day shift. **Exhibit 3**, p. 228, ln. 12 – ln. 17

10

43. Mr. Brown was in the process of training his night shift replacement, John King.  **Exhibit 3**, p. 228, ln. 20 – ln. 22.  The training of a replacement "takes awhile [sic]."  **Exhibit 22**, p. 32, ln. 1 – ln. 3.

#### IV.      UNDISPUTED FACTS – COUNT ONE – SEXUAL HARASSMENT

44. Defendant reincorporates Undisputed Facts Nos. 1 – 43.

45. Mr. Brown states that "playing" took place at the Facility and that "sometimes men engage in conversations that they shouldn't."  **Exhibit 3**, p. 171, ln. 2 and ln. 17 – ln. 18.  Specifically, Mr. Brown says "[w]e – we was playing" and that he owns up to that.  **Exhibit 3**, p. 171, ln. 2 – ln. 4.

46. According to Mr. Brown, the first incident of sexual harassment from Mr. Saunders occurred when they were co-workers. **Exhibit 3**, p. 194, ln. 18 - ln. 23.  Mr. Brown believed the incident to be sexual harassment "[b]ecause it was a violent act, the way he jerked it [a ball cap] off my head – off my head in – in front of me like that." **Exhibit 3**, p. 194, ln. 24 – p. 195, ln. 2.

47. Mr. Brown went on to say that the incident was not sexually related; rather he considered it "a move of aggression" and a "violation of my space." **Exhibit 3**, p. 195, ln. 4 – ln. 8.

48. Mr. Saunders never propositioned Mr. Brown for sex.  **Exhibit 3**, p. 195, ln. 9 – ln. 11. Mr. Brown never heard Mr. Saunders "proposition anybody for sex." **Exhibit 3**, p. 215, ln. 18 – ln. 20.

49. Mr. Brown does not know if Mr. Saunders is a homosexual.  **Exhibit 3**, p. 195, ln. 14 – ln. 16.  Further Mr. Brown is "not sure of anybody's sexual preference" on the night shift and believes they were all married to women.  **Exhibit 3**, p. 216, ln. 12 – ln. 19.

50. The next incident of "harassment" Mr. Brown recalls occurred after Mr. Saunders became a Tech 5.[1]  According to Mr. Brown, Mr. Saunders came up behind him and grabbed his rear end.  **Exhibit 3**, p. 195, ln. 20 – ln. 23; p. 196, ln. 8 - ln. 9. Mr. Brown told Mr. Saunders to stop and said that he would break his hand the next time he did it.  **Exhibit 3**, p. 195, ln. 24 – ln. 25.

51. Mr. Saunders never touched Mr. Brown anywhere besides his butt.  **Exhibit 3**, p. 197, ln. 10 – ln. 11.

52. Mr. Brown claims that when "conversations about sex and stuff" occurred and when "they were doing that" he "would always get out the room."  **Exhibit 3**, p. 171, ln. 21 – ln. 23. Further, Mr. Brown states that Mr. Saunders would "say things to me that were inappropriate, and I would pretty much be in the mode to where I'm just trying to walk away."  **Exhibit 3**, p. 218, ln. 8 – ln. 10.

53. The only way Mr. Brown felt threatened by Mr. Saunders is that he "felt threatened that he [Mr. Saunders] would make me hurt him."  **Exhibit 3**, p. 165, ln. 13 – ln. 16 and p. 196, ln. 20 – ln. 23.

54. With regard to size and stature, Mr. Brown was 6'2" and weighed 300lbs when he worked at Webco.  **Exhibit 3**, p. 165, ln. 5 – ln. 8.  Mr. Saunders was shorter than Mr. Brown and weighed approximately 200lbs.  **Exhibit 3**, p. 165, ln. 9 – ln. 12.

55. Mr. Brown believes Mr. Saunders touched him in this manner because "he was doing it for the reaction."  **Exhibit 3**, p. 196, ln. 1 – ln. 2; p. 198, ln. 8 – ln. 9.

---

[1] A Tech 5 is a leadership position that is selected by management based on an employee's leadership ability and skill.

56. Mr. Brown states Mr. Saunders engaged in similar behavior with Jason LeBert (White male) ("Mr. LeBert"); Gavin Victoria (African-American male) ("Mr. Victoria"), and James Muffoletto (White male) ("Mr. Muffoletto").  **Exhibit 3**, p. 198, ln. 20 – p. 199, ln. 12.

57. Mr. Brown claims to have witnessed Mr. Saunders grabbing other males by their penises. **Exhibit 3**, p. 200, ln. 6.  The first time he saw such an incident was Mr. Saunders grabbing Mr. LeBert by his penis.  **Exhibit 3**, p. 200, ln. 13 - ln. 16.  Mr. Brown states that Mr. Saunders never grabbed him in this manner.  **Exhibit 3**, p. 202, ln. 18 – ln. 19.

58. With regard to Mr. Victoria, Mr. Brown states that he saw Mr. Saunders "one time" grab him by the hips and "hump him".  **Exhibit 3**, p. 209, ln. 9 – ln. 11.  Mr. Brown goes on to say that Mr. Saunders "would bear hug" Mr. Victoria.  **Exhibit 3**, p. 209, ln. 12 – ln. 13.  Mr. Brown does not characterize a "bear hug" as a "sexual-related" act.  **Exhibit 3**, p. 210, ln. 5 – ln. 10.  In fact when describing his intervention in the incident of alleged touching between Mr. Saunders and Mr. Victoria, Mr. Brown states that he "bear hugged Gavin" to stop him from harming Mr. Saunders.  **Exhibit 3**, p. 209, ln. 17 – ln. 20.

59. On numerous occasions, Mr. Saunders, according to Mr. Brown, would ask him and others "Do you want to touch my PePe?" referring to his penis.  **Exhibit 3**, p. 278, ln. 7 – ln. 9 and ln. 13 – ln. 14.  In response, Mr. Brown "would just look at him and just shake my head and say, 'Matt, get away from me.'"  **Exhibit 3**, p. 278, ln. 9 – ln. 11.

60. There was not a female on the night shift during the time of Mr. Brown's employment with Webco.  **Exhibit 3**, p. 199, ln. 13 – ln. 18.

61. In terms of frequency of the alleged acts, Mr. Brown vacillates between saying they occurred "regularly" to stating that "the incidents were sporadic."  **Exhibit 3**, p. 196, ln. 4 and p. 212, ln. 2 – ln. 5.

62. According to Mr. Brown, Mr. Saunders never made any *quid pro quo* statements. **Exhibit 3**, p. 216, ln. 1 – ln. 7 Specifically:

> Q:  Did you ever hear Matt proposition anyone for sex?
> A:  No.
> Q:  Did he ever say to you, that "If you don't have sex with me, I'm going to get you fired"?
> A:  No.  He never --
> Q:  Did he ever say to you, "If you have" – "If you have sex with me, I'll get you promoted or I'll" –
> A:  No. He never said that.
> Q:  Okay.  It wasn't that kind of deal, was it?
> A:  No.

**Exhibit 3**, p. 215, ln. 18 –p. 216,  ln. 5.

63. Despite the fact that his integrity should have compelled him to do so, Mr. Brown did not turn in Mr. Saunders because "[i]t was all about – it was about the money."  **Exhibit 3**, p. 202, ln. 6 – ln. 10.  He claims he did tell Mr. LeBert that as a member of management he needed to report Mr. Saunders, stating "[i]t's your responsibility to go tell on him now."  **Exhibit 3**, p. 201, ln. 8 – ln. 10.

64. Mr. Brown knows of no one who reported an issue directly to Tulsa management. **Exhibit 3**, p. 154, ln. 18 – ln. 21.

65. Mr. Brown knew that management did not know about the alleged harassment by Mr. Saunders.  **Exhibit 3**, p. 212 ln. 24 – p. 213, ln. 2.  If the alleged harassment had been reported to Ms. Allen or Ms. Jordan, Mr. Brown knows "they would have handled it.  They would have probably done an investigation or something like that."  **Exhibit 3**, p. 213, ln. 4 – ln. 10.

## V.   UNDISPUTED FACTS – COUNT TWO – RACIAL DISCRIMINATION

66. Defendant reincorporates Undisputed Facts Nos. 1 – 65.

67. According to Mr. Brown, Mr. LeBert never made a racial comment to him and they "never had a racial problem or anything like that."  **Exhibit 3**, p. 216, ln. 21 – ln. 24.

68. Ms. Brewer never made a racial comment to Mr. Brown.  **Exhibit 3**, p. 216, ln. 25 – p. 217, ln. 1.  Neither Ms. Allen nor Ms. Jordan made a racial comment to Mr. Brown.  **Exhibit 3**, p. 217, ln. 11 – ln. 15.  Further, Mr. Brown was never called the "N word" by any Company supervisor.  **Exhibit 3**, p. 217, ln. 16 – ln. 18.

69. Mr. Bruno and Mr. Brown "talked about black every once in a while."  **Exhibit 3**, p. 217, ln. 2 – ln. 4.  Mr. Brown and Mr. Bruno "had intimate conversations about shoe shining and stuff like that."  **Exhibit 3**, p. 217, ln. 6 – ln. 7.  Mr. Brown admits that he may have offered to shine Mr. Bruno's shoes since he was the boss.  **Exhibit 3**, p. 217, ln. 7 – ln. 9.

70. When asked whether or not Mr. Saunders is a racist, Mr. Brown said "No, I don't think he's a racist.  I think he was racist towards me for various reasons, because he – I disagreed with some of the things he was doing.  It was personal between me and him."  **Exhibit 3**, p. 131, ln. 16 – ln. 21.

71. Mr. Brown is able to recall one specific instance when Mr. Saunders told him that slaves had built the White House.  **Exhibit 3**, p. 133, ln. 9 – ln. 10.  Mr. Saunders also, according to Mr. Brown, said that he hoped President Obama would be assassinated.  **Exhibit 3**, p. 132, ln. 7.  Mr. Brown also claims that Mr. Saunders would call him lazy and comment that black people are lazy, but cannot recall specific instances when he made these comments.  **Exhibit 3**, p. 135, ln. 13 – ln. 20 and ln. 23 – ln. 25.  Further, when asked if Mr. Saunders called other African-American employees lazy, Mr. Brown replied "No" and "Just me."  **Exhibit 3**, p. 169, ln. 5 – ln. 8.

72. Mr. Saunders stopped making racial comments "when he became a Tech 5 technician, pretty much a supervisor."  **Exhibit 3**, p. 138, ln. 5– ln. 12.

15

73. When asked if Mr. Brown had made racial comments similar to those he had made to Mr. Miller, Mr. Brown replied "I'm pretty sure I did.  You've got a – you've got a room full of men…testosterone high."  **Exhibit 3**, p. 171, ln. 7 – ln. 12.  Additionally, Mr. Brown admits to saying at work that "boxing is a black man's sport."  **Exhibit 3**, p. 173, ln. 13 – ln. 15.  Further, Mr. Brown admits to offering to shine the shoes of black and white co-workers.  **Exhibit 3**, p. 175, ln. 10 – ln. 12.  Mr. Brown claims it was a "legitimate joke."  **Exhibit 3**, p. 175, ln. 12 – ln. 13.

74. Mr. Brown was never the only African American on the night shift. According to Mr. Brown, there were always "more than one or two" African Americans.  **Exhibit 3**, p. 224, ln. 8 – ln. 13.

75. Mr. Brown does not believe his race played any role in his not being moved to the HEM saw.  **Exhibit 3**, p. 222, ln. 5 – ln. 7.  Rather, he accepted Mr. Bruno's explanation that the Company was "downsized" so there was not "the opportunity to show you because we need you bending."  **Exhibit 3**, p. 221, ln. 20 – ln. 24.

76. Mr. Brown believes that he was not promoted because of his race.  **Exhibit 3**, p. 224, ln. 17 – ln. 22.  Mr. Brown believes this despite the fact that he admits there were and/or are other African Americans who were and/or are Tech 5's.  **Exhibit 3**, p. 225, ln. 8 – ln. 25.

77. When asked why he believes his race had something to do with his not being promoted to a Tech 5, Mr. Brown claims one only had to look at his resume, which was "advanced."  **Exhibit 3**, p. 224, ln. 17 – ln. 25.    Further, he felt that two or three years of work had earned him the opportunity.  **Exhibit 3**, p. 225, ln. 4 – ln. 7.

78. Mr. LeBert was promoted to Tech 5 and Mr. Brown "was aware that he had two write-ups when he was promoted" and Mr. Brown "had none."  **Exhibit 3**, p. 226, ln. 8 – ln. 13.  In

fact, Mr. Brown had three (3) write-ups – one for the racial comment he made to Mr. Miller, one regarding an issue with an annealer job, and one for hitting a forklift while operating a crane. **Exhibit 3**, p. 149, ln. 4 – ln. 14; **Exhibit 17**; **Exhibit 3**, p. 124, ln. 4 – ln. 10; **Exhibit 20**; **Exhibit 3**, p. 126, ln. 10 – 18; and **Exhibit 21**.

79. Mr. Brown never saw any of Mr. LeBert's performance evaluations and cannot testify that his performance evaluations were better or worse than Mr. LeBert's.  **Exhibit 3**, p. 227, ln. 6 – ln. 12.  He also does not know who made the decision to promote Mr. LeBert.  **Exhibit 3**, p. 227, ln. 13 – ln. 15.

80. The only information as to the poll he alleges took place regarding his potential move to the day shift is hearsay from an African-American employee named "Rodeo".  **Exhibit 3**, p. 183, ln. 1 – ln. 18.  Mr. Brown does not know Rodeo's real name. **Exhibit 3**, p. 183, ln. 14 – ln. 16.

81. In addition to Rodeo, Jerry Mike Campbell, an African-American Tech 5, was assigned to the day shift at this time.  **Exhibit 3**, p. 184, ln. 1 – ln. 2, ln. 5 – ln. 8.

## VI.   UNDISPUTED FACTS – PLAINTIFF'S TERMINATION

82. Defendant reincorporates Undisputed Facts Nos. 1 – 81.

83. During the night shift prior to the date of Mr. Brown's termination, Mr. Brown was training John King, a white employee, who was to be his night shift replacement.  **Exhibit 3**, p. 232, ln. 24 – p. 233, ln. 5.  During that shift, he was advised by a co-worker, Mr. Miller, of a change in job assignment.  **Exhibit 3**, p. 233, ln. 13 – ln. 17.  Mr. Brown took issue with a co-worker as opposed to a supervisor or Tech 5 giving him this information.  **Exhibit 3**, p. 234, ln. 1 – ln. 2.  He was not happy with Mr. Miller giving him work instructions.  **Exhibit 3**, p. 240, ln. 21 – ln. 23.

84. Mr. Brown states that in response he "went in the office and said '[i]f y'all are going to change job positions, that you need to inform me.  As management, you need to come inform me." **Exhibit 3**, p. 233, ln. 18 – ln. 20.  Rayford Bruno and Jason LeBert were in the office at that time. **Exhibit 3**, p. 234, ln. 9 – ln. 10.

85. Mr. Brown then turned the conversation between him and Mr. Bruno to his moving to the day shift. **Exhibit 3**, p. 234, ln. 24 – p. 235, ln. 2.  Mr. Brown told Mr. Bruno that he did not wish to speak with Ms. Brewer about speeding up his move to days, but wanted Mr. Bruno to do so. **Exhibit 3**, p. 235, ln. 5 – ln. 10.

86. Mr. Brown does not dispute that this interaction with Mr. Bruno lasted over an hour and that he should have been working during that time. **Exhibit 3**, p. 236, ln. 5 – ln. 8 and p. 237, ln. 13 – ln. 16.

87. In referring to a videotape of the incident captured by the security camera (no audio), Mr. Brown agrees that he appeared angry during the incident. **Exhibit 3**, p. 242, ln. 4 – ln. 6 (referring to *Deposition Exhibit 25*).

88. Prior to the termination meeting, Mr. Brown and Ms. Brewer had a conversation regarding his moving to the day shift. **Exhibit 3,** p. 249, ln. 22 – ln. 25 and **Exhibit 22**, p. 32, ln. 13 – p. 33, ln. 1.

89. Ms. Brewer told Mr. Brown "to punch out and talk to Sally [Ms. Allen]." **Exhibit 3**, p. 251, ln. 20 – ln. 21.   Mr. Brown does not know why, if he was being respectful as he claims he was, Ms. Brewer told him to punch out. **Exhibit 3**, p. 251, ln. 22- lin. 25.  Ms. Brewer also asked Mr. Bruno to call the police. **Exhibit 3**, p. 252, ln. 5 – ln. 6.

90. Mr. Brown disagrees that he called Ms. Brewer a "fucking bitch" to her face but admits that he thought it. **Exhibit 3**, p. 252, ln. 18 – ln. 21.  Mr. Brown claims he called Ms. Brewer a

"fucking bitch" in the dressing room in the presence of Mr. Bruno.  **Exhibit 3**, p. 253, ln. 17 – ln. 20 and p. 255, ln. 24 – p. 256, ln. 3.

91. Mr. Brown agrees that he was wrong to have called Ms. Brewer a "fucking bitch" and admits that it was a mistake on his part to have done so.  **Exhibit 3**, p. 256, ln. 25 – p. 257, ln. 4. Additionally, Mr. Brown agrees that had he not said what he did, we might not be here today. **Exhibit 3**, p. 257, ln. 5 – ln. 7.

92. According to Mr. Brown, he was terminated the day after his incident with Ms. Brewer. **Exhibit 3**, p. 268, ln. 2 – ln. 5.  Prior to being terminated, there was "a long meeting" attended by Mr. Saunders, Mr. Bruno, and Ms. Brewer and facilitated by Ms. Allen.  **Exhibit 3**, p. 268, ln. 4 – ln. 13 and **Exhibit 22**, p. 29, ln. 14 – ln. 18.

93. At a subsequent meeting between Ms. Allen and Mr. Brown, she asked him what had happened.  **Exhibit 3**, p. 268, ln. 14 – ln. 15.  Mr. Brown told Ms. Allen that he was upset and that he did not remember what had happened.  **Exhibit 3**, p. 252, ln. 22 – ln. 25.  Mr. Brown did not tell Ms. Allen "everything at that time" and admits that he wishes he would have and that the failure to do so was a mistake on his part.  **Exhibit 3**, p. 268, ln. 16 – ln. 24.

94. During the course of the meeting, Ms. Allen offered to help Brown find other employment – "a straight day job" so he could "spend time and bond with" his children – but he refused her offer.  **Exhibit 3**, p. 269, ln. 18 – p. 270, ln. 3.

95. Despite the Company's Open Door Policy, Mr. Brown did not appeal Webco's decision to terminate his employment.  **Exhibit 3**, p. 270, ln. 16 – ln. 20.

## VII.  UNDISPUTED FACTS – POST-TERMINATION

96. Defendant reincorporates Undisputed Facts Nos. 1 – 95.

97. Mr. Brown claims to have suffered psychological injury, but has not sought treatment. **Exhibit 3**, p. 275, ln. 4 – ln. 10.  This is despite the fact that he has insurance coverage under his wife's employer and he stated that "there's no reason why I couldn't."  **Exhibit 3**, p. 275, ln. 2 – ln. 10.

98. With regard to lost benefits, Mr. Brown never had Webco provided health insurance as he has always been covered by his wife's insurance.  **Exhibit 3**, p. 274, ln. 22 – p. 275, ln. 1.  Additionally, while Mr. Brown claims he had to drain his 401k so that his wife could "manage the bills and the house," he admits that he could have taken a loan on his 401k instead of a distribution.  **Exhibit 3**, p. 273, ln. 6 – p. 274, ln. 7.  Further, Mr. Brown elected not to pay expenses with his wife's income.  **Exhibit 3**, p. 273, ln. 17 – ln. 19.

99. For the past fourteen (14) months, Mr. Brown has been employed as a line operator on a rotating shift at United Sabine making approximately $15/hour.  **Exhibit 3**, p. 271, ln. 22 – p. 272, ln. 13.  He anticipates receiving a $2/hour raise in the near future.  **Exhibit 3**, p. 277, ln. 1 – ln. 5.  Brown says it is the "best job I ever had."  **Exhibit 3**, p. 276, ln. 21 – ln. 24.

## VIII.   ARGUMENTS AND AUTHORITIES

### A.  Standard for Summary Judgment

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims and defenses . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Such motions should not be regarded by the courts as disfavored procedural shortcuts but, rather, "as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action."  *Id.* at 327.  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.  A movant need only point out that there is an absence of evidence to support an essential element on the non-moving party's case.  *Id.* at 325.  Then, the non-moving party must go beyond the pleadings and set forth specific facts demonstrating that there is a triable issue.  *Id.* at 324; *see also Lechuga v. Southern Pacific Transport Co.*, 949 F.2d 790, 798 (5th Cir. 1992) ("The party opposing summary judgment must come forward with specific facts showing that there is a genuine issue for trial.").

### B.  Plaintiff Has Not Presented a Claim for Retaliation

In his Complaint, Mr. Brown lists facts that he claims relate to retaliation, but he asserts only two (2) counts:  Sexual Harassment (Count One) and Racial Discrimination (Count Two). *See Complaint*, filed with this Court on May 23, 2012.  Neither of these counts relate to the allegations presented in the "Facts Relating to Retaliation" portion of the Complaint.  Further, should it be determined that Mr. Brown is presenting a claim for retaliatory discharge, it has been established by the Fifth Circuit Court of Appeals that "[t]o make out a claim for retaliation, the plaintiff must show that '(1) [he] participated in a Title VII protected activity, (2) [he] suffered an adverse employment action by [his] employer, and (3) there is a casual connection between the protected activity and the adverse action.'" *Cherry v. Shaw Coastal, Inc.*, 668 F.3d 182, 187-188 (5th Cir. 2012) (quoting *Stewart v. Mississippi Transport Comm.*, 586 F.3d 321, 331 (5th 2009)).

With regard to the first prong, Title VII states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. §2000e-3(a); *see also*

*Banks v. East Baton Rouge Parish School Board*, 320 F.3d 570, 575 n.5 (5th Cir. 2003) (reciting

Title VII's prohibition on retaliation).  In the instant matter, Mr. Brown has not alleged that "he

participated in a Title VII protected activity."  *Cherry*, 668 F.3d at 188.  Specifically, the

allegations contained in the "Facts Relating to Retaliation" section of his Complaint are merely

Mr. Brown's version of the events that eventually led to his termination.  *See Complaint*, filed

with this Court on May 23, 2012.  In the enumerated paragraphs, Mr. Brown describes his desire

to move to days, his version of the conversation he had with Mr. Bruno (*See* Undisputed Facts

Nos. 82, 83, and 84 for additional information regarding this conversation), his version of the

conversation he had with Ms. Brewer the night after his conversation with Mr. Bruno (*See*

Undisputed Facts Nos. 87, 88, and 89 for additional information regarding this conversation),

and his claim that he "had every desire" to report "all his concerns to someone higher in the

company" but that "[t]he threat of losing his job and income was sufficiently terrifying" that he

failed to "sufficiently report all of his concern to corporate authorities or human resources."  *See*

*Complaint*, filed with this Court on May 23, 2012.  These assertions are wholly insufficient to

satisfy the elements required in a retaliation claim.

Furthermore, with regard to Mr. Brown's actual termination, he admits that he called Ms.

Brewer a "fucking bitch," that he was wrong to have done so, and that doing so was a mistake.

Undisputed Fact Nos. 89 and 90.  These admissions eviscerate any causal connection Mr. Brown

may try to establish with regard to his claim of retaliatory discharge.

Mr. Brown cannot be found to have brought forth a successful retaliatory discharge claim

for three (3) reasons:  (1) he failed to present an actual Count of retaliatory discharge in his

Complaint; (2) his Complaint and the Undisputed Facts fail to present evidence that Mr. Brown

was engaged in Title VII protected activity, as is required by law; and (3) the Undisputed Facts

fail to set forth a causal connection between a protected activity and an adverse employment action.

C. **Brown Cannot Establish a Case of Sex Discrimination Via Same-Sex Sexual Harassment Under Title VII**

In his Complaint, Mr. Brown alleges that he was sexually harassed by his Supervisor, Matthew Saunders.  Pursuant to the United States Supreme Court's holding in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998),

> [t]he prohibition of harassment on the basis of sex … forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment. 'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview.'

(quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).  The Supreme Court went on to say that they "have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace -- such as male-on-male horseplay or intersexual flirtation – for discriminatory "conditions of employment." *Oncale*, 523 U.S. at 81.  It is basic law that sexual harassment is a form of sex discrimination. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).  A plaintiff must show that harassment was underline because of sex.  *EEOC v. Boh Bros. Construction Co.*, 689 F.3d 458, 462 (5th Cir. 2012) (citing *Oncale*, 523 U.S. at 81) ("Whatever evidentiary route a plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of sex.'")

The Fifth Circuit Court of Appeals "has established a two-step process for evaluating same-sex sexual harassment cases." *Russell v. Univ. of Texas*, 234 Fed. Appx. 195, 201 (5th Cir.

2007) (unpublished).[2]   First, Mr. Brown must establish "that the sexual harassment was discrimination because of sex."  *Id.* (quoting *LaDay v. Catalyst Tech., Inc.*, 302 F.3d 474, 478 (5th Cir. 2002)).  In *LaDay*, the Fifth Circuit applied the *Oncale* Court's three (3) evidentiary routes a plaintiff can use to "show that an incident of same-sex harassment constitutes sex discrimination:"

> First, he can show that the alleged harasser made "explicit or implicit proposals of sexual activity" and provide "credible evidence that the harasser was homosexual." 523 U.S. at 80. Second, he can demonstrate that the harasser was "motivated by general hostility to the presence of [members of the same sex] in the workplace." *Id.* Third, he may "offer direct, comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."

*LaDay*, 302 F.3d at 478 (quoting *Oncale*, 523 U.S. at 80).  Second, depending on "[w]hether the employee suffered a tangible employment action," the Court determines whether the claim should be analyzed as a *quid pro quo* claim, or a hostile work environment claim.  *Russell*, 234 Fed. Appx. at 201 (citing *Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir. 2000)).

Applying the two-step process to the instant matter, the Undisputed Facts do not establish that Mr. Brown experienced sex discrimination.  First, the Undisputed Facts show that the harassment he allegedly suffered was not "because of sex" using any of *Oncale's* three (3) evidentiary routes.  He fails under the first option, as the Undisputed Facts show there were no "explicit or implicit proposals of sexual activity."  Mr. Brown admits that he never heard Mr. Saunders proposition anyone for sex.  Undisputed Fact No. 48.

Indeed, the first alleged incident of harassment occurred when Mr. Brown and Mr. Saunders were co-workers and it involved Mr. Saunders removing Mr. Brown's Missouri Tigers

---

[2] Unpublished cases are cited pursuant to Rule 32.1 of the Federal Rule of Appellate Procedure and Rule 47.5 of the Rules and Internal Operating Procedures of the United States Court of Appeals for the Fifth Circuit.

hat from his head.[3]  Undisputed Fact No. 46.  According to Mr. Brown the act was "a violation of his space" and aggressive in nature, but not sexual.  Undisputed Fact No. 47.

When asked to describe other instances of harassment he allegedly experienced, Mr. Brown stated that Mr. Saunders grabbed his (Mr. Brown's) rear end and that he witnessed Mr. Saunders grab other males by their penises.  Undisputed Fact Nos. 50 and 57.  Mr. Brown went on to say that he believes Mr. Saunders engaged in this behavior "for the reaction."  Undisputed Fact No. 55.  Other alleged conduct includes a one-time observation by Mr. Brown of Mr. Saunders grabbing Mr. Victoria by the hips and pretending to hump him and Mr. Saunders bear hugging Mr. Victoria, an act Mr. Brown does not consider sexual in nature. Undisputed Fact No. 58.  Mr. Brown also claims that Mr. Saunders would ask him and others to touch his penis by saying "[d]o you want to touch my PePe?"  Undisputed Fact No. 59.  While this comment may, on the surface, appear to be an implicit proposal of sexual activity, Mr. Brown has failed to present any evidence that Mr. Saunders was acting out of sexual desire when he engaged in this behavior.  In *Vickers v. Fairfield Medical Center*, 453 F.3d 757, 765 (6th Cir. 2006), the Sixth Circuit held that the plaintiff's hostile work environment claim failed because he "did not indicate that his harassers acted out of sexual desire."  Rather, the alleged conduct is more in line with the comments referenced by the Seventh Circuit Court of Appeals in *Johnson v. Hondo, Inc.*, 125 F.3d 408, 412 (7th Cir. 1997), wherein it was held that the use of phrases such as "Fuck me" and "kiss my ass" between men "has no connection whatsoever with the sexual acts to which they make reference."  In the instant matter, the alleged incidents of sexual harassment presented by Mr. Brown fail to rise beyond male-on-male horseplay, particularly when viewed in

---

[3] In *Kummerle v. EMJ Corp.*, 2013 U.S. App. LEXIS 9856, at *4 (5th Cir May 16, 2013) (unpublished), the Fifth Circuit held that "[o]ffensive and unprofessional behavior by co-workers is not, alone, a violation of law."

the context and atmosphere that these incidents allegedly took place.[4]  In this regard, according to Mr. Brown's own admission, "playing" took place at the Facility and sometimes those on the night shift (to include Mr. Brown) engaged "in conversations they shouldn't."  Undisputed Fact No. 45.  Further, it has been held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citing *Oncale*, 523 U.S. at 82 (1998)).  The *Faragher* Court went on to say that "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." *Id.* at 788.  Furthermore, the Court then said that "[p]roperly applied, they [the standards] will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* (quoting B. LINDEMANN & D. KADUE, SEXUAL HARASSMENT IN EMPLOYMENT LAW 175 (1992) (footnotes omitted)).  Additionally, and importantly, **Mr. Brown states that Mr. Saunders never propositioned him or anyone else for sex**.  Undisputed Fact No. 48.

With regard to Mr. Saunders' sexuality, Mr. Brown stated that he does not know if Mr. Saunders is a homosexual and does not know the sexual preference of anyone on the night shift. Undisputed Fact No. 49.  In *LaDay*, the Fifth Circuit Court held that "there are two types of evidence that are likely to be especially 'credible' proof that the harasser may be homosexual" – (1) evidence "that the harasser intended to have some kind of sexual contact with the plaintiff rather than merely to humiliate him for reasons unrelated to sexual interest" or (2) "proof that the alleged harasser made same-sex sexual advances to others, especially other employees." *LaDay*, 302 F.3d at 480.  In the instant matter, it is undisputed (and established by Mr. Brown's own

---

[4] In *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81-82 (1998), the Supreme Court stated that "[i]n same-sex (as in all) harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target."

admission) that Mr. Saunders' motivation was not sexual in nature, but rather more in line with a desire to humiliate or, as Mr. Brown put it, "for the reaction." Undisputed Fact No. 55.

None of the conduct alleged by Mr. Brown constitutes "sex discrimination" under this Circuit's precedent. *LaDay*, 302 F.3d at 478.  In *Kreamer v. Henry's Marine, et al.*, 2004 U.S. Dist. LEXIS 206775, at *5-*7 (E.D. La. 2004), a case involving alleged same-sex harassment, the United States District Court for the Eastern District of Louisiana held that the following conduct was insufficient to constitute sex discrimination: the plaintiff being grabbed "in the area of his crotch" on at least three (3) or four (4) occasions, the alleged harasser stating that "he would like to compare packages" while grabbing the plaintiff in his crotch area, the plaintiff being grabbed between his legs from the front, and a burn on plaintiff's wrist from an attempt by the alleged harasser to place the lighter between plaintiff's legs. *Id*. at *5.  The court analyzed this conduct under *LaDay's* first evidentiary route, holding that the evidence as a whole indicated the harasser's "intent to bully, humiliate, and/or annoy plaintiff," and not his "sincere desire for sexual contact." *Id*. at *20.  Further, as referenced previously, the Seventh Circuit Court of Appeals has held that often the use of phrases such as "Fuck me" and "kiss my ass" between men "has no connection whatsoever with the sexual acts to which they make reference – even when they are accompanied . . . with crotch-grabbing gestures. *Johnson*, 125 F.3d at 412.  The Sixth Circuit Court of Appeals held that a plaintiff who had his buttocks grabbed, his rear poked with a hammer handle, and his rear poked with a long sucker rod failed to establish that the harassment was actionable under Title VII because he was unable to establish that the alleged harasser was homosexual. *Wasek v. Arrow Energy Servs. Inc.*, 682 F.3d 463, 468 (6th Cir. 2012).  Further, the Sixth Circuit said that "the conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's gender." *Id*. at 467.

As such, the Undisputed Facts show that the alleged conduct did not involve "explicit or implicit proposals of sexual activity" or that Mr. Saunders is a homosexual, both of which are required in order to establish sexual discrimination under the first option under *Oncale*, which is the standard adopted by the Fifth Circuit Court of Appeals.

There are no facts which would establish same-sex harassment as sex discrimination under the second option, which in the instant matter would require a showing that Mr. Saunders had a general hostility towards men at the workplace.

Further, the third option does not apply to the instant matter, as there were no females working on the night shift during the time when Mr. Brown was employed.  Undisputed Fact No. 60.  As such, there is no direct, comparative evidence as to how Mr. Saunders treated males and females in the workplace.[5]  Therefore, the Undisputed Facts clearly fail to establish sex discrimination via same-sex harassment under any of the avenues set out by *Oncale* and *LaDay*.

**1. Even if Mr. Brown could establish the alleged conduct constitutes discrimination because of sex, he cannot establish such conduct created a hostile work environment**

Assuming *arguendo* that the activity was because of sex, Mr. Brown is unable to establish either a *quid pro quo* claim or a hostile work environment claim.

**a. Tangible Employment Action**

*Quid pro quo* claims require that the plaintiff suffer a tangible employment action. *Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir. 2000).  According to the United States Supreme Court's holding in *Burlington Industries, Inc. v. Ellerth*, "[a] tangible employment

---

[5] Other Circuit Courts have addressed the issue of a lack of evidence regarding a mixed-gender workplace. Specifically, the Sixth Circuit Court of Appeals, in *Wasek*, 682 F.3d at 468, the court held that since "the oil rig was not a mixed-sex workplace" the plaintiff could not present comparative evidence and, as such, "in order to infer discrimination, Wasek must demonstrate Ottobre was homosexual."  In *Vickers*, 453 F.3d at 765, the Sixth Circuit held that the plaintiff's hostile work environment claim failed because '[n]othing in the [the plaintiff's] complaint indicates that his harassers acted out of sexual desire," the complaint did not "support an interference that there was general hostility toward men in the workplace" and he presented no information as to how women were treated in comparison to men and did nothing to dispute the assertion that the plaintiff's workplace was all-male.

action constitutes a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  524 U.S. 742, 761-762 (1998).  Mr. Brown is not alleging that he suffered a tangible employment action as a result of Mr. Saunders' alleged harassment and he admits that Mr. Saunders did not engage in any *quid pro quo* behavior.  Undisputed Fact No. 62.

### b.  Hostile Environment

Thus, since Mr. Brown did not suffer a tangible employment action, "the alleged sexual harassment is viewed as a 'hostile environment' case."  *Casiano*, 213 F.3d at 284.  Therefore, in order to make a *prima facie* case under a hostile work environment, Mr. Brown must show the following:

> (1) The employee belongs to a protected group, i.e., a simple stipulation that the employee is a man or a woman; (2) The employee was subject to unwelcome sexual harassment, i.e., sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee; (3) The harassment complained of was based upon sex, i.e., that but for the fact of her sex, the plaintiff would not have been the object of harassment; (4) The harassment complained of affected a "term, condition, or privilege of employment," i.e., the sexual harassment must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment; (5) Respondeat superior, i.e., that the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Jones v. Flagship Int'l*, 793 F.2d 714, 719 (5th Cir. 1986) *see also Hockman v. Westward Communs., L.L.C.*, 407 F.3d 317, 325 (5th Cir. 2004) (reciting the elements of a hostile work environment claim).

With regard to the fourth prong, the Undisputed Facts show that the conduct was not "sufficiently pervasive" or severe to create an abusive work environment.  It has been established

that "[c]onduct sufficient to create a hostile working environment must be severe or pervasive." *Septimus v. The Univ. of Hous.*, 399 F.3d 601, 611 (5th Cir. 2005) (ref. *Ellerth*, 524 U.S. at 752. Further, in order "[t]o be actionable, the alleged harassment must have created an environment that a reasonable person would find hostile or abusive." *Id.* at 611 (quoting *Woods v. Delta Bev. Group, Inc.*, 274 F.3d 295, 299 (5th Cir. 2001)).   The determination as to "[w]hether an environment is hostile or abusive depends on the totality of the circumstances, including factors such as the frequency of the conduct, its severity, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with employee's work performance." *Id.* at 611 (ref. *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21-22).   Mr. Brown is unable to consistently characterize the frequency of the alleged harassing behavior, stating that it took place "regularly" and then saying "the incidents were sporadic." Undisputed Fact No. 61.

Further, as stated previously, there were various incidents of alleged harassment that Mr. Brown did not characterize sexual in nature.  Undisputed Fact Nos. 47 and 58.  Additionally, the Undisputed Facts do not present any evidence that Mr. Saunders' alleged conduct interfered with Mr. Brown's employment.  Rather, Mr. Brown was promoted several times during the time he claims the harassment occurred – in fact, Mr. Saunders played a role in the decision to promote him to a Tech 4.  Undisputed Fact Nos. 24, 26, and 28.  Additionally, Mr. Brown received several successful performance evaluations during the relevant time frame.  Undisputed Fact Nos. 22, 23, 26, 27, and 37.  Additionally, Mr. Brown is of the opinion that he worked harder than anyone else and always did a good job.  Undisputed Fact Nos. 24, 27, and 30.

**Significantly, much of the alleged conduct was not personally experienced by Mr. Brown**.  In *Septimus*, 399 F.3d at 612, the Fifth Circuit addressed this issue noting that the

plaintiff had "not personally experienced most (if not all) of the conduct complained of by other women."  With regard to alleged harassment personally experienced by Mr. Brown, it was one instance of Mr. Saunders removing a ball cap from Mr. Brown's head (an incident that occurred prior to Mr. Saunders move into a supervisory position) and butt grabbing.  Undisputed Fact Nos. 46 and 50.    Mr. Saunders never touched him anywhere else.  Undisputed Fact No. 51.  Thus, the alleged conduct that was personally experienced by Mr. Brown is neither severe, nor pervasive.

It is clear that, if Mr. Brown is going to base a hostile environment claim on harassment done to others, he must establish that the harassment affected <u>his</u> employment conditions (not that of the "others").  *Septimus*, 399 F.3d at 611-612.  It should be noted that Mr. Brown stated that whenever the supposedly offensive activities and talk would start he "would always get out the room."  Undisputed Fact No. 52.  In Mr. Brown's own words, he advanced up through the ranks and was a good employee.  Undisputed Fact Nos. 24, 26, 27, 28, and 30.  Further, the Undisputed Facts show Mr. Brown was not intimidated by Mr. Saunders.  Undisputed Fact Nos. 50 and 53.  On the one occasion of butt grabbing as to which he testified with any specificity, Mr. Brown told Mr. Saunders to stop and that "I'm going to break your hand the next time you do that."  Undisputed Fact No. 50.  With regard to size and stature, Mr. Brown is 6'2'' and weighs 300lbs. whereas Mr. Saunders is shorter and weighs 100lbs. less than Mr. Brown.  Undisputed Fact No. 54.  When asked if he felt threatened by Mr. Saunders, Mr. Brown replied only "in the fact that he would make me hurt him."  Undisputed Fact No. 53.

### 2. Should the Court find Mr. Saunders' alleged conduct created a hostile environment, Webco is not liable under the *Ellerth/Faragher* affirmative defense

While an employer may be "subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor[6] with immediate (or successively higher) authority over the employee," the Supreme Court has established an affirmative defense available to employers in certain situations where a tangible employment action has not taken place. *Faragher*, 524 U.S. at 807 (1998); *see also Ellerth*, 524 U.S. at 765. Specifically, the defense requires that it be established "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* The Fifth Circuit Court of Appeals held in *Lauderdale v. Tex. Dep't of Crim. Justice*, 512 F.3d 157, 164 (5th Cir. 2007) (citing *Faragher*, 524 U.S. at 807), that an employer must satisfy the two (2) requirements by a preponderance of the evidence.

In the instant matter, Webco's Employee Handbook contained a detailed Anti-Harassment Policy and Sexual Harassment Policy, which clearly states that "[h]arassment will not be tolerated by Webco under any circumstances." **Exhibit 7**. The Policy goes on to describe and define harassment, to include sexual harassment, and lays out a clear Complaint Procedure. **Exhibit 7**. The Complaint Procedure language that applies directly to the instant matter states, "[i]f the complaint involves the supervisor harassing the employee or if the employee is uncomfortable going to their supervisor, the employee may approach any other member of WEBCO's management *or the Human Resources Department*. **Exhibit 7** (emphasis added).

---

[6] We will assume for purposes of this Motion that Mr. Saunders was a supervisor as contemplated by United States Supreme Court precedent. Webco reserves the right to argue at trial that he was not a supervisor. Further, it is undisputed that the "Missouri Tigers hat incident" occurred when Mr. Saunders was merely a co-worker. Undisputed Fact No. 19.

As such, the Policy provided multiple avenues of complaint in an effort to account for the fact that an employee may not wish to complain to their immediate supervisor or similar.  The Policy goes on to state "[y]ou should also immediately report it [harassment], using the complaint procedure described."  **Exhibit 7**.  In addition to having the Policy in place, Webco also provided training to its employees on the content of its policies, to include its Anti-Harassment Policy and Sexual Harassment Policy.  Undisputed Fact Nos. 11, 17, and 18.

Mr. Brown admits that he received a copy of the Company Handbook and that he received training on Webco policies.  Undisputed Fact Nos. 10 and 11; **Exhibit 6**.  Mr. Brown also claims to have been aware of the Anti-Harassment and Sexual Harassment Policies and admits to having "read some of it."  Undisputed Fact No. 12.  Additionally, Mr. Brown knew that employees were to report harassment, including sexual harassment (he had been trained on sexual harassment prior to coming to work at Webco, as well as receiving training on it during his employment with the Company).  Undisputed Fact Nos. 4, 5, and 14.  Mr. Brown also stated that that he received extensive sexual harassment training when he was a supervisor at a prior employer and that he had a pretty good understanding of sexual harassment.  Undisputed Fact Nos. 4 and 5.

In *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 413 (5th Cir. 2002), the Fifth Circuit held that an employer's sexual harassment policy was "more than adequate" for purposes of the first prong of *Ellerth/Faragher*.  Specifically, the employer "maintained a sexual harassment policy which it promulgated to all employees, including Wyatt, and that she knew that the policy instructed employees to report harassing incidents and to whom the report should be made.  In addition, Hunt held regular meetings with its supervisory staff to train them on preventing sexual

harassment." *Id.* at 410.  Applying this standard to the instant matter, for the reasons stated above, Webco clearly satisfies the first prong of the *Ellerth/Faragher*.

Turning to the second prong, it is clear that Mr. Brown "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.  By his own admission, Mr. Brown did not turn Mr. Saunders in to Ms. Jordan or Ms. Allen, nor did he report to either one of them the harassment he claims to have experienced (although he claims he encouraged Mr. LeBert to do so).  Undisputed Fact No. 63.

While Mr. Brown claims that he reported the alleged conduct to Mr. Bruno and Mr. Bruno did nothing (an assertion which Mr. Bruno and Webco dispute), the Fifth Circuit has held that this is insufficient effort on the part of a plaintiff.  Specifically, in *Wyatt*, 297 F.3d at 413, the court said that "when it became clear to [plaintiff] that [the higher supervisor] was not only ineffective in dealing with [her immediate supervisor's] harassment … [plaintiff]'s failure to report either [of their] behavior to one or more among the other individuals listed in the sexual harassment policy was unreasonable."  Further, in *Indest v. Freeman Decoration*, 164 F.3d 258, 266-267 (5th Cir. 1999), the Fifth Circuit cited the *Faragher* holding wherein the United States Supreme Court held that "[i]f the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided."  (citing *Faragher*, 524 U.S. at 807).

The Fifth Circuit went on to say that "*Faragher* implies that a plaintiff should not wait as long as it usually takes for a sexually hostile working environment to develop when the company has an effective grievance mechanism.  If the plaintiff complains promptly, the then-incidental

misbehavior can be stymied before it erupts into a hostile environment." *Indest*, 165 F.3d at 267. As such, Mr. Brown's own inaction in the face of his knowledge of Webco's Anti-Harassment Policy and Sexual Harassment Policy, his training on the Policy, and his clear admission that he did not report the alleged harassment to Human Resources (particularly in light of his claim – which is disputed by Webco and Mr. Bruno – that reporting the conduct to Mr. Bruno brought about no change), Defendant has satisfied the second prong of *Ellerth/Faragher*. Thus, because Webco has satisfied the two (2) prongs of the *Ellerth/Faragher* affirmative defense it cannot be found liable.

On a related note, it is anticipated that Mr. Brown will claim that the threat of losing his job terrified him to the point that he was unable to report "all his concerns" to "corporate authorities or human resources." *See Complaint*, filed with this Court on May 23, 2012. This excuse is of no use to Mr. Brown in this matter. First, Webco had in place in policy prohibiting retaliation. **Exhibit 7**. Second, it has been held "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment." *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999); *see also Harper v. City of Jackson Municipal School District*, 149 Fed. Appx. 295, 301 (5th Cir. 2005) (unpublished) (an "explanation that she [the employee] was too intimidated to report the sexual harassment is insufficient to show that her failure to complain and cooperate were reasonable."). Third, "[a]ll harassment victims risk retaliation when they complain. For Title VII to be properly facilitated, the reasons for not complaining about harassment should be substantial and based upon objective evidence that some significant retaliation will take place." *Id.* (quoting *Young v. R.R. Morrison and Son, Inc.*, 159 F. Supp. 2d 921, 927 (N.D. Miss. 2000)). Additionally, a generalized fear of retaliation for reporting the harassment has been found to be

insufficient, rather, as previously stated, the employee's reasons for not reporting must be "substantial and based upon objective evidence that some significant retaliation will take place." *Williams v. Barnhill's Buffet*, 2007 U.S. Dist. LEXIS 95568, at *24 (S.D. Miss. 2007) (quoting *Harper*, 149 Fed. Appx. at 302 (unpublished).

It is undisputed that Mr. Brown cannot substantiate his alleged fears regarding the loss of his job if he reported "all his concerns."  We need look no further than Mr. Brown's own assessment of would have happened if the "harassment" had been reported.  When asked how he knew that management did not know about the alleged harassment, he states that he knew that "they would have handled it" and would have likely "did [sic] an investigation or something like that." Undisputed Fact No. 65.  Further, Mr. Brown has failed to establish an objective basis for his fear of retaliatory discharge – he has presented no evidence of other employees who were retaliated against for reporting harassment.  Instead, he has testified that he knows of no one who reported an issue directly to Tulsa management, thus he is unable to say what would have happened had he done so.  Undisputed Fact No. 64.

## D.  Brown's Claim of Racial Discrimination Fails to Satisfy the Legal Requirements

With regard to his claim of racial discrimination, Mr. Brown claims that he was treated differently than white employees, namely that a co-worker Mr. LeBert was promoted to a Tech 5 position[7] instead of him.  Further, he claims that Ms. Brewer took a poll of day shift employees (mixed race) to determine if they wanted Mr. Brown on the day shift with them.

In *McCoy v. City of Shreveport*, 492 F.3d 551 (5th Cir. 2007), the Fifth Circuit Court of Appeals laid out the framework for claims of racial discrimination based on circumstantial evidence.  Specifically, the court stated that

---

[7] There is only one Tech 5 position per shift, so there are only 3 Tech 5 positions available.  **Exhibit 22**, p. 19, ln. 17 – ln. 24.

> the plaintiff must first establish a prima facie case of discrimination, which requires a showing that the plaintiff (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group.

*Id* at 556. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

While the Undisputed Facts establish that Mr. Brown is a member of a protected group, he is unable to satisfy the other requirements.  Specifically, the Undisputed Facts do not support the notion that Mr. Brown was qualified (or more qualified) for the Tech 5 position than other eligible candidates, including Mr. LeBert.  Undisputed Fact Nos. 78 and 79.  Rather, Mr. Brown's belief that his race played a part in his not being promoted stems from his opinion that his resume was "advanced" and that he had put in his time.  Undisputed Fact No. 77.  A review of Mr. Brown's employee file indicates that he scored an overall "Needs Improvement" on his June 2009 performance evaluation (given by Mr. Bruno, an African-American), as well as a "Needs Improvement" in the Skills/Knowledge area.  Undisputed Fact No. 31.  The 2009 and 2010 performance evaluations given by Mr. Saunders noted that he needed improvement in the Skills/Knowledge area.  **Exhibits 18 and 19**.  Mr. Brown also has had several serious counselings, both for a racial incident which he admittedly initiated and for serious quality and safety problems.  Undisputed Fact Nos. 34 and 38.  Additionally, Mr. Brown received comments in his performance evaluations that said he needed to become more of a leader and demonstrate leadership skills.  Undisputed Fact No. 36.  As such, his allegation that he was a better candidate than Jason LeBert for the Tech 5 position is unsubstantiated.  Undisputed Fact Nos. 78 and 79.  Mr. Brown admitted that he does not know what Mr. LeBert's qualifications are.  Undisputed Fact No. 79.

With regard to the third prong of the framework, the decision not to promote Mr. Brown had nothing to do with his race.  Rather, there exists a myriad of acceptable reasons as to why he was not selected for the Tech 5 positions – his employment history (counselings, etc.) being one. According to Ms. Brewer, Mr. Brown was a "difficult employee" and "[h]e had several problems over the course of time" he worked at Webco.  **Exhibit 22**.  Thus, his membership in a protected class played no role in the Company's decision not to promote Mr. Brown to a Tech 5 position. Additionally, with regard to decisions to promote, it is the employer's judgment, not that of the employee, that is relevant.  It has been held by the Tenth Circuit Court of Appeals that it "will not second guess business decisions made by employers, in the absence of some evidence of impermissible motives." *Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1427 (10th Cir. 1993) (citing *Lucas v. Dover Corp., Norris Div.*, 857 F.2d 1397, 1403-1404 (10th Cir. 1988)).  As such, it is not a court's role to act as a super-personnel department that second guesses business judgment.  *Faulkner*, 3 F.3d at 1426-1427; *see also McVille v. Inter-Community Healthcare, Inc.*, 460 Fed. Appx. 353, 355 (5th Cir. 2012) (unpublished) *quoting Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995) ([T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.").

In terms of the fourth prong, the Undisputed Facts provide no evidence that Mr. Brown was treated less favorably than non-minority employees who were similarly situated employees. **Most importantly, it is undisputed that Webco did have other black employees who had been promoted to Tech 5 and, in Mr. Bruno's case, to an even higher position**.  Undisputed Fact No. 76.

38

With regard to the alleged "poll," Mr. Brown has only presented hearsay evidence, which is inadmissible.  Undisputed Fact No. 80.  Specifically, he claims to have heard about the poll from a co-worker whose real name he does not even know – Mr. Brown claims the employee goes by "Rodeo."  Undisputed Fact No. 80.  Mr. Brown has no direct knowledge of the alleged poll.  Additionally, and of significant importance, the matter of a "poll" is moot in light of the fact that Mr. Brown admits he was going to be moved to days.  Undisputed Fact Nos. 40 and 42. In fact, at the time of his termination he was training his night shift replacement.  Undisputed Fact Nos. 43 and 83. As such, Mr. Brown's assertions regarding the alleged "poll" do not serve to bolster his claim of racial discrimination.  In sum, the Undisputed Facts fail to establish a successful claim for racial discrimination.

## IX.   CONCLUSION

WHEREFORE, Defendant respectfully requests that this Court render judgment in its favor and against the Mr. Brown, that his claims be dismissed, and that Defendant be granted its costs and attorney fees.

Respectfully submitted,

**STRECKER & ASSOCIATES, P.C.**


*/s/ Yvette Braaks Hart*
David E. Strecker, OBA #8687
Yvette Braaks Hart, OBA #19476
2150 Mid-Continent Tower
401 South Boston Avenue
Tulsa, Oklahoma 74103-4009
Telephone:     (918) 582-1716
Facsimile:     (918) 582-1780

**CASHIOLA AND BEAN**
Randal Cashiola, Texas Bar No. 03966802
2090 Broadway, Suite A
Beaumont, Texas 77701
Telephone:     (409) 813-1468
Facsimile:     (409) 813-1467
E-mail:  rcashiola@cashiolabean.law

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 30th day of May, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

GERTZ ADAIR LAW FIRM
Ryan Gertz & Andrew Gertz
2630 Liberty
Beaumont, Texas 77702
(409) 833-6400

**ATTORNEYS FOR PLAINTIFF**

_____/s/Yvette Braaks Hart_____